I fully concur in the judgment of the Court as announced by the Chancellor, that the act of the General Assembly of this State of the eleventh of August, 1864, entitled "An Act to raise revenue for the State," in so far as it applies to the transportation of passengers through, from, into, or out of this State, is unconstitutional and void. Rulings which have been made sustaining State Laws in regard to police, the preservation of health, bridges and other matters of a local nature, are evidently exceptional in their character, and cannot be considered as of controlling authority in a case like this. The Act of Assembly in question is clearly and expressly a tax law, a law to raise revenue for the use of the State, a law imposing "a tax at and after the rate of ten cents "for every passenger" transported within the State, and requiring the same to be paid into the hands of the State Treasurer for the use of the State. It is specifically a tax to be applied to general State purposes. *Page 200 
But it has been contended that this tax is in terms, imposed on the company in respect to its business as a common carrier, and not on passengers transported by it; and that the intention of the Legislature to impose the burden upon the business of the company is made clearly apparent by the language of the act itself, which expressly declares that every person, corporation, or company engaged in the business of transporting or carrying passengers by steam power, shall pay to the State Treasurer, for the use of the State, a tax at and after the rate of ten cents for every passenger so transported. Not that the passenger, but that the company shall pay the tax, the aggregate amount of which shall be measured and determined by the number of passengers transported. Such, in brief, is the argument of the counsel for the plaintiff on the question of construction, and their reading and interpretation of the act.
Now, I beg to remark that on considering the act with the view of determining its true construction, we must look beyond its phraseology to the substance and real meaning underlying the mere letter of the act. If I were to confine myself to the language merely of the first clause of the first section, disconnected from the proviso of that section, and also from the provisions of the fourth section, I might perhaps, if it were not for the Nevada case, hold the tax to be a tax upon the business of the company, and not upon the passengers. But when I find, as I do, upon reading the proviso, that where on the same occasion the passenger travels over several connecting roads belonging to different companies, only one tax of ten cents is required to be paid for traveling over all the connecting roads, and that this tax is to be paid by the company upon whose road the journey began, thus entirely exempting from taxation all the other connecting roads in the State, over which the passenger may travel in the course of his journey; and that, in ascertaining the aggregate amount of the tax to be paid, "all persons carried who are soldiers or sailors of the United States," are to be omitted *Page 201 
from the estimate of the number of passengers actually carried: and when, in addition to this, I consider that by the fourth section of the act, the company is expressly authorized to increase its charge for transportation, "to the amount of tax," beyond what the passenger would otherwise have been required to pay, thus making the passenger actually pay the tax before commencing his journey, I am forced to the conclusion that it cannot properly be held to be a tax on the business of the company.
To be properly a tax on business, as such, it would seem to me, that it should be laid or assessed, either on the entire business operations of the company, or on the results of its whole business, or on all its business of a particular class or description, without exception or exemption. Now, there is no reference whatever contained in the act, to the general business of the company. On the contrary, it refers solely and exclusively to persons, to the transportation of passengers, not of passengers generally, but of passengers other than soldiers and sailors of the United States. Personality, therefore, thus limited to but part of a class, though a large one, and nothing else in respect to business, runs through the whole act. It is a tax at and after the rate of ten cents for every passenger transported, except that in estimating the number of passengers, soldiers and sailors of the United States carried over the road shall not be counted. All other persons transported are to be counted, and the tax to be levied has respect to them alone. Certainly the business of the company includes, as well the carriage of "Soldiers and Sailors of the United States," as of all other persons. The former are passengers transported for hire as well as the latter, and if it be a tax on the business of transportation, why should soldiers and sailors of the United States be omitted in estimating or counting the number of passengers carried over the road? We are told, however, that the act provides for payment of the tax by the company. And so it does. But then, as the tax is required to be paid by that company alone on whose road the passenger begins his *Page 202 
journey, exempting from taxation all the other connecting roads in the State, over which he may travel in the course of his journey, and as by the fourth section of the act, the company is expressly authorized to increase its charge for transportation "to the amount `of the tax'," and thus to exact payment of the tax from the passenger before permitting him to begin his journey, it is manifest that the true meaning of the act, as well as its practical operation and effect, is to impose the tax on the passengers. But it is unnecessary to consider this branch of the subject any further. Even if I entertained serious doubts as to the true construction of the act, I should feel myself bound by the judgment of the Supreme Court of the United States, in the case of Crandall vs. TheState of Nevada, 6 Wall. 35. That decision, as I understand it disposes of this case. It decides that a State cannot directly or indirectly tax persons for passing through or out of the State, and that the act of the State of Nevada imposing a tax on railroad and stage companies for every passenger carried out of the State by them, was a tax on the passenger, and not a tax on the business of the companies.
After a careful examination of the provisions of the act of the State of Nevada, I confess myself unable to distinguish it upon principle, from the act of this State now under consideration. If there be any difference between them other than in phraseology, I think it is rather in favor of the Nevada Statute. It seems to me, however, that the decision of the constitutional question involved in the Nevada Case, was placed by the majority of the Court upon grounds somewhat new and peculiar, and as might have been expected, not altogether satisfactory to the judicial mind of the country. And while I do not presume to say that the decision cannot be sustained on the grounds upon which they have preferred of place it, yet I can not but think they might have based it upon ground much more stable and satisfactory, namely, upon the solid ground of the commercial clause of the Federal Constitution. *Page 203 
Now, if the commercial clause be struck out from the body of the constitution, what particular section, provision, or clause of that instrument can be specified and invoked as a limitation upon, or as a negation of the power of the States to tax passengers for the privilege of passing through their respective territories? I confess I know of none. And hence if no other provision of the constitution can be pointed out as affording protection againts State interference or obstruction to the free intercourse of the citizens of our common country among the several States, it strikes me as being perfectly obvious, that the commercial clause must have greatly influenced the minds of the judges in their consideration of the Nevada Case, because the great principle of supreme sovereignty in regard to commerce or intercourse embodied in that clause, and as I think, to be found no where else, manifestly underlies all the reasoning upon which the majority of the Court have seen fit to place their judgment. And surely if this be so, it would, at least, have been safe and in accord with previous judicial interpretation, to have placed their decision squarely upon the commercial clause. If power to regulate commerce means power to regulate the intercourse of the citizen among the several States, the right of every citizen to free transit, would appear to come within both the letter and spirit of this grant of power, and to be fully protected against State interference. And if this be so, I beg respectfully to ask where was the necessity for resorting to the uncertain and debatable ground of the implied powers of the Federal Constitution? Here is an express grant of power covering the whole subject, why then, look beyond this for something else that is shadowy and indefinite? And what is more vague and debatable than the doctrine of the implied powers of the Constitution? Moreover, does not the fact of the grant of an express power to regulate commerce, that is to say, to regulate intercourse among the several States, which is complete and plenary in itself, seem to amount to a negation of the existence of an implied power *Page 204 
in regard to the same subject matter? I am aware that the majority of the Court may have found themselves embarrassed by conflicting dicta, and want of harmony of views among the Judges in several former cases, for it is certainly true, as they say in the recent case of Hinson vs.Lott, 8 Wall. 148, that "the question of the nature of the power to regulate commerce, and how far that power is exclusively vested in Congress, has always been a difficult one, and has seldom been construed with unanimity." Thus conceding, however, that it has sometimes been construed with unanimity. But although it is unfortunately too true, that since the year 1827 the Supreme Court has been generally more or less divided in opinion upon the question of the nature and extent of the power to regulate commerce, yet it has never been decided, even by a divided court, that the power was not exclusively vested in Congress. On the contrary, we have the authority of the case of Gibbons vs. Ogden, 9 Wheat. 1, decided in the year 1824, in which it was unanimously settled upon the most solemn deliberation, Chief Justice Marshall delivering the opinion of the Court, and Mr. Justice Johnson concurring in a separate opinion, that the power to regulate commerce is vested exclusively in the Government of the United States. The same doctrine substantially was held in 1827, in the case ofBrown vs. The State of Maryland, 12 Wheat. 419. And notwithstanding the differing opinions of the Judges which, as I have said, most unfortunately afterward divided the Court upon this question, the doctrine settled in Gibbons vs. Ogden, as to the exclusive nature of the power, has never been overruled by any subsequent decision. The case of the City of New York vs. Miln, 11 Peters, 102, can not be considered as having shaken the authority of Gibbons vs. Ogden. Indeed, the opinion delivered by Mr. Justice Barbour, and reported in 11 Peters, 102, as the opinion of the Court — a divided Court at best — never had at any time the sanction of a majority of the Court, except in a single particular which did not in any wise impair the authority of Gibbons vs. Ogden. All *Page 205 
that was said in that opinion in regard to the power of Congress to regulate commerce, and especially the declaration that "persons were not the subject of commerce," was said without the concurrence of a majority of the Court. It was not the intention of the Court in that case to modify in any respect whatever the doctrine settled and expressed in the opinions delivered in the cases of Gibbons vs. Ogden and Brown vs.Maryland; see Mr. Justice Wayne's opinion in the Passenger Cases, 7 How.429, 430, 431, 432, 433.
Under the circumstances it seems to me that it would have been quite as safe to have placed the decision in the Nevada Case upon the solid ground of the commercial clause, supported by the maturely considered and unanimous judgment of Chief Justice Marshall and his learned and able associates in the case of Gibbons vs. Ogden, as to have placed it, as they did, upon the uncertain and debatable ground of the implied powers of the Federal Constitution, supported only by the mere dictum of the venerable Chief Justice Taney contained in the concluding paragraph of his dissenting opinion in the Passenger Cases. You may say indeed that this dictum contains a great principle in regard to the citizens of the States as members of the Union — and I concede it — yet still you find this same principle clearly and firmly embodied in the commercial clause, as the shield and protection of the citizen, and as a denial of the right of the States to obstruct or interfere with free transit. *Page 206