## CRANDALL *v.* STATE OF NEVADA.

1. A special tax on railroad and stage companies for every passenger carried out of the State by them is a tax on the passenger for the privilege of passing through the State by the ordinary modes of travel, and is not a simple tax on the business of the companies.
2. Such a tax imposed by a State is not in conflict with that provision of the Federal Constitution which forbids a State to lay a duty on exports.
3. The power granted to Congress to regulate commerce with foreign nations and among the States, includes subjects of legislation which are necessarily of a national character, and, therefore, exclusively within the control of Congress.
4. But it also includes matters of a character merely local in their operation, as the regulation of port pilots, the authorization of bridges over navigable streams and perhaps others, and upon this class of subjects the State may legislate in the absence of any such legislation by Congress.
5. If the tax on passengers when carried out of the State be called a regulation of commerce, it belongs to the latter class; and there being no legislation of Congress on the same subject the statute will not be void as a regulation of commerce.
6. The United States has a right to require the service of its citizens at the seat of Federal government, in all executive, legislative, and judicial departments; and at all the points in the several States where the functions of government are to be performed.

7. By virtue of its power to make war and to suppress insurrection, the government has a right to transport troops through all parts of the Union by the usual and most expeditious modes of transportation.

8. The citizens of the United States have the correlative right to approach the great departments of the government, the ports of entry through which commerce is conducted, and the various Federal offices in the States.

9. The taxing power being in its nature unlimited over the subjects within its control, would enable the State governments to destroy the above-mentioned rights of the Federal government and of its citizens if the right of transit through the States by railroad and other ordinary modes of travel were one of the legitimate objects of State taxation.

10. The existence of such a power in the States is, therefore, inconsistent with objects for which the Federal government was established and with rights conferred by the Constitution on that government and on the people. An exercise of such a power is accordingly void.

ERROR to the Supreme Court of Nevada.

In 1865, the legislature of Nevada enacted that "there shall be levied and collected a capitation tax of one dollar upon every person leaving the State by any railroad, stage coach, or other vehicle engaged or employed in the business of transporting passengers for hire," and that the proprietors, owners, and corporations so engaged should pay the said tax of one dollar for each and every person so conveyed or transported from the State. For the purpose of collecting the tax, another section required from persons engaged in such business, or their agents, a report every month, under oath, of the number of passengers so transported, and the payment of the tax to the sheriff or other proper officer.

With the statute in existence, Crandall, who was the agent of a stage company engaged in carrying passengers through the State of Nevada, was arrested for refusing to report the number of passengers that had been carried by the coaches of his company, and for refusing to pay the tax of one dollar imposed on each passenger by the law of that State. He pleaded that the law of the State under which he was prosecuted was void, because it was in conflict with the Constitution of the United States; and his plea being overruled, the case came into the Supreme Court of the State. That court—considering that the tax laid was not an impost on "exports,"

nor an interference with the power of Congress "to regulate commerce among the several States"—decided against the right thus set up under the Federal Constitution.

Its judgment was now here for review.

*No counsel appeared for the plaintiff in error, Crandall, nor was any brief filed in his behalf.*

*Mr. P. Phillips, who filed a brief for Mr. T. J. D. Fuller, for the State of Nevada:*

The law in question is not in conflict with that clause of the Constitution of the United States, which provides that "no State shall, without the consent of Congress, lay any imposts or duties on imports or exports," &c. *Persons* carried out of a State are not "exports" within the meaning of this clause. An export is a "*thing* exported," not a *person.**

Nor in conflict with the provision that "Congress shall have power to regulate commerce among the several States," &c. The grant of power here given to Congress has never yet been exercised by it. It has enacted no statute upon the subject of inter-state travel. And while thus dormant and not exercised by Congress, it does not deprive the several States of the power to regulate commerce among themselves, a power which confessedly belonged to them before the adoption of the Constitution of the United States. In all decided cases where analogous laws of the several States have been held unconstitutional, it has been because of their alleged conflict with laws *actually enacted* by Congress under the power given that body by the Constitution "to regulate commerce with foreign nations and with Indian tribes." In such case of course the State law must give way.†

* Brown *v.* State of Maryland, 12 Wheaton, 488; City of New York *v.* Miln, 11 Peters, 136; License Cases, 5 Howard, 594.

† Gibbons *v.* Ogden, 9 Wheaton, 200; Houston *v.* Moore, 5 Id. 21; Willson *v.* Blackbird Creek Marsh Company, 2 Peters, 252; Brown *v.* State of Maryland, 12 Wheaton, 448; License Cases, 5 Howard, 504, 574, 578, 579 580-6; Ib. 607, 618, 619, 624-5.

In addition the law in question is not intended as a regulation of commerce among the States, but *as a tax* for the support of the State government. A law passed thus *diverso intuitu* does not become a regulation of commerce merely because in its operation it may bear indirectly upon commerce.*

The power of taxation, like the police power, is indispensable to the existence of a State government, and it has never been pretended that it is impaired by any clause of the Federal Constitution, except so far and in such respects as that instrument *expressly* prohibits it. To take away that power *by inference* would be to open the way for entire destruction of State government.†

Finally. The tax in question is not a poll-tax, nor can it be made so by being described by the law as a "capitation tax." It is not levied on, nor paid by the passenger himself; but it is paid by the common carrier, at the rate of so much for each passenger carried by him. It is strictly a tax on his business, graduated by the amount of such business, as are license taxes, which often are made to vary *pro rata* with the amount of business done by the person taking the license. Suppose that the State, after examining the affairs of this particular stage company, had found that it carried a thousand passengers per year, and without any reference to what they had observed, laid a tax of a thousand dollars a year on all stage companies engaged in business like that of Crandall. Would that tax be unconstitutional? The State makes roads. It keeps them in repair. It must in some way be paid in order to be able to do all this. And what difference does it make whether it be paid by a tax of one dollar on each passenger, or by the same sum collected at a toll-gate, or by a gross sum for a license?

Nor does the tax become a poll-tax by falling ultimately

---

* Gibbons *v.* Ogden, 9 Wheaton, 201–4; City of New York *v.* Miln, 11 Peters, 102.

† Cases generally cited *ante;* McCulloch *v.* State of Maryland, 4 Wheaton, 316, 427–36.

upon the passengers carried, any more than does the tax upon liquors become a poll-tax because ultimately paid by him who drinks the liquor.   It remains a tax upon the busi ness, whoever pays it at last.

Mr. Justice MILLER delivered the opinion of the court.

The question for the first time presented to the court by this record is one of importance.   The proposition to be considered is the right of a State to levy a tax upon persons residing in the State who may wish to get out of it, and upon persons not residing in it who may have occasion to pass through it.

It is to be regretted that such a question should be sub-mitted to our consideration, with neither brief nor argument on the part of plaintiff in error.   But our regret is diminished by the reflection, that the principles which must govern its determination have been the subject of much consideration in cases heretofore decided by this court.

It is claimed by counsel for the State that the tax thus levied is not a tax upon the passenger, but upon the business of the carrier who transports him.

If the act were much more skilfully drawn to sustain this hypothesis than it is, we should be very reluctant to admit that any form of words, which had the effect to compel every person travelling through the country by the common and usual modes of public conveyance to pay a specific sum to the State, was not a tax upon the right thus exercised.   The statute before us is not, however, embarrassed by any nice difficulties of this character.   The language which we have just quoted is, that there shall be levied and collected a capitation tax upon every person leaving the State by any railroad or stage coach; and the remaining provisions of the act, which refer to this tax, only provide a mode of collecting it.   The officers and agents of the railroad companies, and the proprietors of the stage coaches, are made responsible for this, and so become the collectors of the tax.

We shall have occasion to refer hereafter somewhat in detail, to the opinions of the judges of this court in *The Pas-*

*senger Cases,*\* in which there were wide differences on seve-ral points involved in the case before us.  In the case from New York then under consideration, the statute provided that the health commissioner should be entitled to demand and receive from the master of every vessel that should ar-rive in the port of New York, from a foreign port, one dol-lar and fifty cents for every cabin passenger, and one dollar for each steerage passenger, and from each coasting vessel, twenty-five cents for every person on board.  That statute does not use language so strong as the Nevada statute, in-dicative of a personal tax on the passenger, but merely taxes the master of the vessel according to the number of his pas-sengers; but the court held it to be a tax upon the passenger, and that the master was the agent of the State for its collec-tion.  Chief Justice Taney, while he differed from the ma-jority of the court, and held the law to be valid, said of the tax levied by the analogous statute of Massachusetts, that "its payment is the condition upon which the State permits the alien passenger to come on shore and mingle with its citizens, and to reside among them.  It is demanded of the captain, and not from every separate passenger, for conveni-ence of collection.  But the burden evidently falls upon the passenger, and he, in fact, pays it, either in the enhanced price of his passage or directly to the captain before he is allowed to embark for the voyage.  The nature of the trans-action, and the ordinary course of business, show that this must be so."

Having determined that the statute of Nevada imposes a tax upon the passenger for the privilege of leaving the State, or passing through it by the ordinary mode of passenger travel, we proceed to inquire if it is for that reason in con-flict with the Constitution of the United States.

In the argument of the counsel for the defendant in error, and in the opinion of the Supreme Court of Nevada, which is found in the record, it is assumed that this question must be decided by an exclusive reference to two provisions of

---

\* 7 Howard, 283.

the Constitution, namely : that which forbids any State, without the consent of Congress, to lay any imposts or duties on imports or exports, and that which confers on Congress the power to regulate commerce with foreign nations and among the several States.

The question as thus narrowed is not free from difficulties.   Can a citizen of the United States travelling from one part of the Union to another be called an export?   It was insisted in *The Passenger Cases* to which we have already referred, that foreigners coming to this country were imports within the meaning of the Constitution, and the provision of that instrument that the migration or importation of such persons as any of the States then existing should think proper to admit, should not be prohibited prior to the year 1808, but that a tax might be imposed on such importation, was relied on as showing that the word import, applied to persons as well as to merchandise.   It was answered that this latter clause had exclusive reference to slaves, who were property as well as persons, and therefore proved nothing.   While some of the judges who concurred in holding those laws to be unconstitutional, gave as one of their reasons that they were taxes on imports, it is evident that this view did not receive the assent of a majority of the court. The application of this provision of the Constitution to the proposition which we have stated in regard to the citizen, is still less satisfactory than it would be to the case of foreigners migrating to the United States.

But it is unnecessary to consider this point further in the view which we have taken of the case.

As regards the commerce clause of the Constitution, two propositions are advanced on behalf of the defendant in error. 1. That the tax imposed by the State on passengers is not a regulation of commerce.   2. That if it can be so considered, it is one of those powers which the States can exercise, until Congress has so legislated, as to indicate its intention to exclude State legislation on the same subject.

The proposition that the power to regulate commerce, as granted to Congress by the Constitution, necessarily excludes

the exercise by the States of any of the power thus granted, is one which has been much considered in this court, and the earlier discussions left the question in much doubt. As late as the January Term, 1849, the opinions of the judges in *The Passenger Cases* show that the question was considered to be one of much importance in those cases, and was even then unsettled, though previous decisions of the court were relied on by the judges themselves as deciding it in different ways. It was certainly, so far as those cases affected it, left an open question.

In the case of *Cooley* v. *Board of Wardens,\** four years later, the same question came directly before the court in reference to the local laws of the port of Philadelphia concerning pilots. It was claimed that they constituted a regulation of commerce, and were therefore void. The court held that they did come within the meaning of the term " to regulate commerce," but that until Congress made regulations concerning pilots the States were competent to do so.

Perhaps no more satisfactory solution has ever been given of this vexed question than the one furnished by the court in that case. After showing that there are some powers granted to Congress which are exclusive of similar powers in the States because they are declared to be so, and that other powers are necessarily so from their very nature, the court proceeds to say, that the authority to regulate commerce with foreign nations and among the States, includes within its compass powers which can only be exercised by Congress, as well as powers which, from their nature, can best be exercised by the State legislatures; to which latter class the regulation of pilots belongs. " Whatever subjects of this power are in their nature national, or admit of one uniform system or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." In the case of *Gilman* v. *Philadelphia,†* this doctrine is reaffirmed, and under it a bridge across a stream navigable from the ocean, authorized by State law, was held to be

---

\* 12 Howard, 299.                    † 3 Wallace, 713.

well authorized in the absence of any legislation by Congress affecting the matter.

It may be that under the power to regulate commerce among the States, Congress has authority to pass laws, the operation of which would be inconsistent with the tax imposed by the State of Nevada, but we know of no such statute now in existence. Inasmuch, therefore, as the tax does not itself institute any regulation of commerce of a national character, or which has a uniform operation over the whole country, it is not easy to maintain, in view of the principles on which those cases were decided, that it violates the clause of the Federal Constitution which we have had under review.

But we do not concede that the question before us is to be determined by the two clauses of the Constitution which we have been examining.

The people of these United States constitute one nation. They have a government in which all of them are deeply interested. This government has necessarily a capital established by law, where its principal operations are conducted. Here sits its legislature, composed of senators and representatives, from the States and from the people of the States. Here resides the President, directing through thousands of agents, the execution of the laws over all this vast country. Here is the seat of the supreme judicial power of the nation, to which all its citizens have a right to resort to claim justice at its hands. Here are the great executive departments, administering the offices of the mails, of the public lands, of the collection and distribution of the public revenues, and of our foreign relations. These are all established and conducted under the admitted powers of the Federal government. That government has a right to call to this point any or all of its citizens to aid in its service, as members of the Congress, of the courts, of the executive departments, and to fill all its other offices; and this right cannot be made to depend upon the pleasure of a State over whose territory they must pass to reach the point where these services must be rendered. The government, also, has its offices of secon-

dary importance in all other parts of the country. On the sea-coasts and on the rivers it has its ports of entry. In the interior it has its land offices, its revenue offices, and its sub-treasuries. In all these it demands the services of its citizens, and is entitled to bring them to those points from all quarters of the nation, and no power can exist in a State to obstruct this right that would not enable it to defeat the purposes for which the government was established.

The Federal power has a right to declare and prosecute wars, and, as a necessary incident, to raise and transport troops through and over the territory of any State of the Union.

If this right is dependent in any sense, however limited, upon the pleasure of a State, the government itself may be overthrown by an obstruction to its exercise. Much the largest part of the transportation of troops during the late rebellion was by railroads, and largely through States whose people were hostile to the Union. If the tax levied by Nevada on railroad passengers had been the law of Tennessee, enlarged to meet the wishes of her people, the treasury of the United States could not have paid the tax necessary to enable its armies to pass through her territory.

But if the government has these rights on her own account, the citizen also has correlative rights. He has the right to come to the seat of government to assert any claim he may have upon that government, or to transact any business he may have with it. To seek its protection, to share its offices, to engage in administering its functions. He has a right to free access to its sea-ports, through which all the operations of foreign trade and commerce are conducted, to the sub-treasuries, the land offices, the revenue offices, and the courts of justice in the several States, and this right is in its nature independent of the will of any State over whose soil he must pass in the exercise of it.

The views here advanced are neither novel nor unsupported by authority. The question of the taxing power of the States, as its exercise has affected the functions of the Federal government, has been repeatedly considered by this

court, and the right of the States in this mode to impede or embarrass the constitutional operations of that government, or the rights which its citizens hold under it, has been uniformly denied.

The leading case of this class is that of *McCulloch* v. *Maryland.** The case is one every way important, and is familiar to the statesman and the constitutional lawyer. The Congress, for the purpose of aiding the fiscal operations of the government, had chartered the Bank of the United States, with authority to establish branches in the different States, and to issue notes for circulation. The legislature of Maryland had levied a tax upon these circulating notes, which the bank refused to pay, on the ground that the statute was void by reason of its antagonism to the Federal Constitution. No particular provision of the Constitution was pointed to as prohibiting the taxation by the State. Indeed, the authority of Congress to create the bank, which was strenuously denied, and the discussion of which constituted an important element in the opinion of the court, was not based by that opinion on any express grant of power, but was claimed to be necessary and proper to enable the government to carry out its authority to raise a revenue, and to transfer and disburse the same. It was argued also that the tax on the circulation operated very remotely, if at all, on the only functions of the bank in which the government was interested. But the court, by a unanimous judgment, held the law of Maryland to be unconstitutional.

It is not possible to condense the conclusive argument of Chief Justice Marshall in that case, and it is too familiar to justify its reproduction here; but an extract or two, in which the results of his reasoning are stated, will serve to show its applicability to the case before us. "That the power of taxing the bank by the States," he says, "may be exercised so as to destroy it, is too obvious to be denied. But taxation is said to be an absolute power which acknowledges no other limits than those prescribed by the Constitution, and, like

---

* 4 Wheaton, 316.

sovereign power of any description, is trusted to the discretion of those who use it. But the very terms of this argument admit that the sovereignty of the State in the article of taxation is subordinate to, and may be controlled by, the Constitution of the United States." Again he says, "We find then, on just theory, a total failure of the original right to tax the means employed by the government of the Union for the execution of its powers. The right never existed, and the question of its surrender cannot arise." . . . .
" That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very means, is declared to be supreme over that which exerts the control, are propositions not to be denied. If the States may tax one instrument employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent rights; they may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make their government dependent on the States."

It will be observed that it was not the extent of the tax in that case which was complained of, but the right to levy any tax of that character. So in the case before us it may be said that a tax of one dollar for passing through the State of Nevada, by stage coach or by railroad, cannot sensibly affect any function of the government, or deprive a citizen of any valuable right. But if the State can tax a railroad passenger one dollar, it can tax him one thousand dollars. If one State can do this, so can every other State. And thus one or more States covering the only practicable routes of travel from the east to the west, or from the north to the south, may totally prevent or seriously burden all transportation of passengers from one part of the country to the other.

A case of another character in which the taxing power as exercised by a State was held void because repugnant to the Federal Constitution, is that of *Brown* v. *The State of Maryland.**

The State of Maryland required all importers of foreign merchandise, who sold the same by wholesale, by bale or by package, to take out a license, and this act was claimed to be unconstitutional. The court held it to be so on three different grounds: first, that it was a duty on imports; second, that it was a regulation of commerce; and third, that the importer who had paid the duties imposed by the United States, had acquired a right to sell his goods in the same original packages in which they were imported. To say nothing of the first and second grounds, we have in the third a tax of a State declared to be void, because it interfered with the exercise of a right derived by the importer from the laws of the United States. If the right of passing through a State by a citizen of the United States is one guaranteed to him by the Constitution, it must be as sacred from State taxation as the right derived by the importer from the payment of duties to sell the goods on which the duties were paid.

In the case of *Weston* v. *The City of Charleston*† we have a case of State taxation of still another class, held to be void as an interference with the rights of the Federal government. The tax in that instance was imposed on bonds or stocks of the United States, in common with all other securities of the same character. It was held by the court that the free and successful operation of the government required it at times to borrow money; that to borrow money it was necessary to issue this class of national securities, and that if the States could tax these securities they might so tax them, as to seriously impair or totally destroy the power of the government to borrow. This case, itself based on the doctrines advanced by the court in *McCulloch* v. *The State of Maryland*, has been followed in all the recent cases involving State

---

* 12 Wheaton, 419.                    † 2 Peters, 449.

taxation of government bonds, from that of *The People of New York* v. *Tax Commissioners*,* to the decisions of the court at this term.

In all these cases the opponents of the taxes levied by the States were able to place their opposition on no express provision of the Constitution, except in that of *Brown* v. *Maryland*. But in all the other cases, and in that case also, the court distinctly placed the invalidity of the State taxes on the ground that they interfered with an authority of the Federal government, which was itself only to be sustained as necessary and proper to the exercise of some other power expressly granted.

In *The Passenger Cases*, to which reference has already been made, Justice Grier, with whom Justice Catron concurred, makes this one of the four propositions on which they held the tax void in those cases. Judge Wayne expresses his assent to Judge Grier's views; and perhaps this ground received the concurrence of more of the members of the court who constituted the majority than any other. But the principles here laid down may be found more clearly stated in the dissenting opinion of the Chief Justice in those cases, and with more direct pertinency to the case now before us than anywhere else. After expressing his views fully in favor of the validity of the tax, which he said had exclusive reference to foreigners, so far as those cases were concerned, he proceeds to say, for the purpose of preventing misapprehension, that so far as the tax affected American citizens it could not in his opinion be maintained. He then adds: "Living as we do under a common government, charged with the great concerns of the whole Union, every citizen of the United States from the most remote States or territories, is entitled to free access, not only to the principal departments established at Washington, but also to its judicial tribunals and public offices in every State in the Union. . . . For all the great purposes for which the Federal government was formed we are one people, with one common country.

---

* 2 Black. 620.

We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, as freely as in our own States.   And a tax imposed by a State, for entering its territories or harbors, is inconsistent with the rights which belong to citizens of other States as members of the Union, and with the objects which that Union was intended to attain. Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it."

Although these remarks are found in a dissenting opinion, they do not relate to the matter on which the dissent was founded.   They accord with the inferences which we have already drawn from the Constitution itself, and from the decisions of this court in exposition of that instrument.

Those principles, as we have already stated them in this opinion, must govern the present case.

Mr. Justice CLIFFORD.   I agree that the State law in question is unconstitutional and void, but I am not able to concur in the principal reasons assigned in the opinion of the court in support of that conclusion.   On the contrary, I hold that the act of the State legislature is inconsistent with the power conferred upon Congress to regulate commerce among the several States, and I think the judgment of the court should have been placed exclusively upon that ground. Strong doubts are entertained by me whether Congress possesses the power to levy any such tax, but whether so or not, I am clear that the State legislature cannot impose any such burden upon commerce among the several States. Such commerce is secured against such legislation in the States by the Constitution, irrespective of any Congressional action.

The CHIEF JUSTICE also dissents, and concurs in the views I have expressed.

JUDGMENT REVERSED, and the case remanded to the Supreme Court of the State of Nevada, with directions to discharge the plaintiff in error from custody.