**HARDYMAN et al. v. COLLINS et al.**
No. 12120.

United States Court of Appeals
Ninth Circuit.
May 29, 1950.

Writ of Certiorari Granted Oct. 9, 1950.
See 71 S.Ct. 63.

A. L. Wirin, Fred Okrand and Robert R. Rissman, Los Angeles, Cal. (Nanette Dembitz, Arthur Garfield Hays, William Egan Colby and Peter H. Kaskell, New York City, counsel, American Civil Liberties Union, of counsel), for appellants.

George Penney, Los Angeles, Cal., Aubrey N. Irwin, Glendale, Cal., Robert M. Newell and Theodore A. Chester, Los Angeles, Cal., for appellees.

Arthur J. Goldberg, Gen. Counsel, Thomas E. Harris, Asst. Gen. Counsel, Washington, D.C. (Jay A. Darwin, San Francisco, Cal., of counsel), for Cong. of Ind. Org., as amicus curiae.

Loren Miller, Los Angeles, Cal., Thurgood Marshall and Jack Greenberg, New York City, for Nat'l Ass'n for Adv. of Colored People, as amicus curiae.

Will Maslow, New York City (Shad Polier, Joseph B. Robison and Howard M. Squadron, New York City, of counsel) for American Jewish Cong., as amicus curiae.

Before HEALY, McALLISTER,* and ORR, Circuit Judges.

ORR, Circuit Judge.

The trial court entered a judgment of dismissal of an amended complaint on the ground that it did not state a cause of action for damages under § 47(3) of Title 8 U.S.C.A.[1] The correctness of that ruling is the subject of this appeal. The

---

* Sixth Circuit, sitting by special designation.

1. 8 U.S.C.A. § 47(3):
"Depriving persons of rights or privileges.
"(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or

amended complaint, in substance, alleged that appellants are citizens of the United States and are members of the Crescenta-Canada Democratic Club. Appellant Morse is chairman of the club and appellant Hardyman is chairman of the program and publicity committee.

The Crescenta-Canada Democratic Club, hereinafter called the club, is a voluntary association, duly organized and chartered by the Los Angeles County Democratic Central Committee and recognized officially as a Democratic club. Its claimed purposes were to participate in the election of officials of the United States, including the President, Vice-President and members of Congress; to petition the National Government for redress of grievances; to engage in public meetings for the discussion of national public issues, including the international and foreign policies of the United States.

Pursuant to a customary practice the club held regular public meetings in the city of La Crescenta at which affairs of national interest and importance were discussed and such action taken thereon as the members deemed advisable. The club arranged for and scheduled a public meeting in the city of La Crescenta for the evening of November 14, 1947, at which a named speaker was to discuss the foreign policy of the United States, including the Marshall plan. The discussion was to be participated in by the members of the club and others attending the meeting. It was also understood that at said meeting a resolution would be presented opposing the Marshall plan with the understanding that such a resolution, if passed, would be forwarded to the President of the United States, the State Department and members of Congress. Said resolution was intended to be a petition for redress of grievances with respect to the Marshall plan. At previous meetings similar resolutions had been adopted and forwarded to officials of the Government.

Appellees, having knowledge that a meeting of the club was to be held November 14, and also being informed of the program and purposes of said meeting, entered into a conspiracy to break up said meeting and to prevent the adoption and transmission of the proposed resolution. In furtherance of such conspiracy appellees went to the building in which the meeting was being held, threatened to and did assault appellants, ordered those attending the meeting to leave and thus forced those in attendance to disperse and by threats and violence prevented those attending the meeting from adopting and transmitting the proposed resolution. Appellees had not conspired or interfered with public meetings held with the knowledge of appellees by organizations expressing views with which appellees agreed and at which resolutions were adopted respecting the foreign policies of the United States. The trial court held that § 47(3) of Title 8 U.S.C.A. does not sanction a cause of action against private individuals who interfere with the privilege of assembling to petition Congress and to discuss national affairs unless the interference is committed by the state or a person acting under authority thereof.

In short, the question presented is whether § 47(3) authorizes a civil suit for damages against private individuals for interfering, pursuant to a conspiracy, with an assemblage of citizens to discuss United States foreign policy and to petition the national government for redress of grievances. This broad question embraces three issues: 1. Did Congress intend to create such a civil action by the enactment of § 47(3)? 2. If so, did Congress have constitutional power to do so? 3. Granted the constitutional power, is the statute a prop-

as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby an-

other is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

er exercise thereof? We deal with the questions in the order named.

### Intended Scope of § 47(3).

The District Court concluded that the statute was intended to give a remedy for deprivation of rights only by persons acting under color of state law. We think it embraces the deprivation of federal rights by private individuals and that such is the interpretation given the statute by the Supreme Court of the United States.

Section 47(3) begins: "If two or more persons in any State or territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, * * *." The disguise portion of the statute, it is obvious, is not concerned with state officials and it is equally obvious that the words "two or more persons" cannot be read to mean only persons acting under color of state law when a simple conspiracy is involved and, at the same time, read to mean private individuals where there is a disguise. It will be noted that the statute also provides: "If two or more persons * * * conspire * * * for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws, * * *" It does not seem reasonable to construe "two or more persons" to mean "state officials" as applied to that kind of conspiracy. The applicability of the statute to private individuals is reinforced by a reading of the section in its original context. 17 Stat. 13. 8 U.S.C.A. § 47 was originally § 2 of the Act of April 20, 1871. Section 1 of that Act was 8 U.S.C.A. § 43, which explicitly applies to deprivations of rights under color of state law. Had Congress intended both provisions to be applicable to state action, it would not have inserted that requirement in the first section and omitted it from the second.

The United States Supreme Court has held that a statute identical in part with § 47(3) was directed "exclusively against the action of private persons, without reference to the laws of the states, or their administration by the officers, * * *." United States v. Harris, 1882, 106 U.S. 629, 640, 1 S.Ct. 601, 610, 27 L.Ed. 290. The statute there involved described in identical language the conspiracies set forth in the first two clauses of § 47(3) and made such conspiracies a crime without the requirement of acts done in furtherance of the conspiracy set forth in the last clause of § 47(3).

The legislative history of § 47(3) further warrants the conclusion that it was intended to afford relief against acts of individuals. Although the Act embodying said section was entitled "An Act to Enforce the Fourteenth Amendment," it was the theory of Congress that the Fourteenth Amendment gave the federal Government power to protect individual civil rights against individual action. See, Congressional Globe, 42nd Cong., 1st. Sess., pp. 367–68, 607–08, Appendix 68–69. As Representative Shellabarger, chairman of the House committee responsible for the bill, explained it, the provision in the Fourteenth Amendment that all persons born or naturalized in the United States are citizens thereof gave Congress the power to protect directly the privileges and immunities of United States citizens. He included in these privileges and immunities protection by the Government, the enjoyment of life and liberty, the right to acquire and possess property, etc., citing the passage in Corfield v. Coryell, 1823, 6 Fed. Cas. p. 546, No. 3,230, quoted in the Slaughterhouse Cases, 1872, 16 Wall. 36, 83 U.S. 36, 76, 21 L.Ed. 394. See, Congressional Globe, supra, Appendix 69. That this theory of the scope of the Fourteenth Amendment has since been held invalid does not detract from its persuasiveness in determining congressional intent.[2]

The congressional debates reveal that the Act was intended to curb the activities of private individuals and, in particular,

---

2. A further indication that Congress believed it had broad power to protect civil rights from individual action is found in other statutes passed during this period. U. S. v. Reese, 1875, 92 U.S. 214, 23 L.Ed. 563, and James v. Bowman, 1903, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979, held unconstitutional two sections of

the Ku Klux Klan. Considerable criticism was aimed at the bill (which then included criminal as well as civil sanctions) because, it was thought, the federal Government would thereby be required to enter the field of punishing individuals for ordinary assault, trespass, etc. The answer was that the bill would only protect the citizen in such rights as he had under the federal Constitution and laws. Among such rights was the right to express opinions "on all subjects which are not against the good order of the Government in which we live." Congressional Globe, supra, 382-83. The enactment was designed to protect others in addition to racial minorities. Congressional Globe, supra, 391, 394, Appendix 166-67, 181.

The district court, in part, based its conclusion that the statute applied to state actions upon the word "equal". The reason given by Representative Shellabarger 'for using the word "equal" to describe the protected rights was "to confine the authority of this law to the prevention of deprivations which shall attack the equality or rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section." Congressional Globe, supra, 478. Thus, 'the violation by an individual of a right which is enjoyed equally by other citizens is the denial of an "equal" privilege or immunity. Any such willful violation is inherently a purposeful discrimination against the victim. There is not present the problem, which is present in cases of alleged denial of equal protection by state officials, of distinguishing between purposeful discrimination and mere erroneous application of a valid state law. See, e.g., Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.

We are aware of the recent cases which characterize § 47(3) as giving federal protection only against state action. Love v. Chandler, 8 Cir., 1942, 124 F.2d 785; Viles v. Symes, 10 Cir., 1942, 129 F.2d 828. Such a holding is contrary to a construction placed on similar language by the United States Supreme Court in the case of United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290.

It is apparent that Congress intended by § 47(3) to provide a federal civil action by private individuals against other individuals for the deprivation of personal rights, among which are the rights alleged in the complaint in the instant case. It is quite as apparent that the courts have substantially limited the protection intended, holding some of the expressed protection to be beyond the power of Congress to provide.

### Constitutional Power of Congress to Redress the Acts Alleged in the Complaint.

Dual rights exist under our federal system which the federal Government has power to protect. One set of rights, comprehended in the due process and equal protection clauses of the Fourteenth Amendment, as well as in the Fifteenth and Nineteenth Amendments and certain portions of the original Constitution, is subject to federal protection only as against state action. Another, much narrower set of rights is subject to federal protection from invasion by individuals. The existence of rights of federal citizenship, subject to federal protection, was recognized before the adoption of the Fourteenth Amendment in Crandall v. Nevada, 1867, 6 Wall. 35, 73 U.S. 35, 18 L.Ed. 744, wherein was recognized a federal right of free access to the seat of government. The concept of a dual system was set forth in the Slaughterhouse Cases, 1872, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394, which distinguished the priv-

the Act of May 31, 1870, which purported to make it a crime for individuals to interfere with the voting rights of others without limitation to the right to vote for federal offices. Hodges v. United States, 1906, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65, and The Civil Rights Cases,

1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, also held unconstitutional statutes which protected personal rights to contract, sue, enter places of public accommodation, etc., from individual interference.

ileges and immunities of United States citizenship from those of state citizenship.

The delineation by the courts of the narrow area of rights which Congress has constitutional power to protect from individual invasion has developed through the application of what is now 18 U.S.C.A. § 241, originally enacted May 31, 1870. This statute has been applied to individual deprivations of the right to vote for federal offices, Ex parte Yarborough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; the right to enjoy the privileges granted by the homestead laws, United States v. Waddell, 1884, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673; the right to protection from attack while in the custody of a federal marshal, Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429; and the right to inform federal officers of violations of federal law, In re Quarles, 1895, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080; Motes v. United States, 1900, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150. The cases also indicate by way of dictum that the right to assemble for the purpose of discussing the policies of the federal Government and petitioning that Government for redress of grievances is within the scope of direct federal protection. In United States v. Cru'kshank, 1876, 92 U.S. 542, 23 L.Ed. 588, the Supreme Court had before it an indictment under what is now § 241 charging the defendants with having deprived certain citizens of their right to assemble together peaceably with other citizens for a peaceful and lawful purpose. The court held that the indictment was insufficient because it did not charge that the attempted assembly was for a purpose connected with the national Government. But, the court went on to declare: "The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for anything else connected with the powers or the duties of the national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances. If it had been alleged in these counts that the object of the defendants was to prevent a meeting for such a purpose, the case would have been within the statute, and within the scope of the sovereignty of the United States. Such, however, is not the case. The offence, as stated in the indictment, will be made out, if it be shown that the object of the conspiracy was to prevent a meeting for any lawful purpose whatever." 92 U.S. 542, 552–553, 23 L.Ed. 588.

This passage has been repeatedly cited by the Supreme Court as establishing the right of assembly for national purposes as a federally protected right. See, Presser v. Illinois, 1886, 116 U.S. 252, 267, 6 S.Ct. 580, 29 L.Ed. 615; Logan v. United States, 1892, 144 U.S. 263, 286, 12 S.Ct. 617, 36 L.Ed. 429; In re Quarles, 1895, 158 U.S. 532, 535, 15 S.Ct. 959, 39 L.Ed. 1080; Hague v. C. I. O., 1939, 307 U.S. 496, 513, 522, 59 S.Ct. 954, 83 L.Ed. 1423. In Powe v. United States, 1940, 109 F.2d 147, the Court of Appeals for the Fifth Circuit stated that it had no doubt that Congress had power to protect directly the rights of citizens to assemble peaceably to petition the federal Government for redress. The court also said: "Because the federal government is a republican one in which the will of the people ought to prevail, and because that will ought to be expressive of an informed public opinion, the freedom of speaking and printing on subjects relating to that government, its elections, its laws, its operations and its officers is vital to it." 5 Cir., 109 F.2d 147, 151.

We conclude that the rights alleged to have been violated in the instant case are within that narrow area of rights which Congress has constitutional power to protect from individual invasion. We do not think that such a holding necessitates the opening up of the federal courts to a multitude of private suits for trespass, assault and similar invasion of private rights which are within the competence of the states to protect. A representative government cannot function properly unless its officers are informed of the opinions and desires of the people whom they represent.

To protect the right to assemble for the purposes alleged in this case is to keep open those vital channels of communication between government and the governed. This protection is within the power granted Congress by Article I, § 8: "To make all Laws which shall be necessary and proper for carrying into Execution * * * all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

### Constitutionality of the Statute as Applied to the Complaint.

In the above discussion we have held that Congress intended, in enacting § 47(3), to give an action against individuals for infringement of individual civil rights, including the right to assemble and petition the federal Government for redress of grievances, a right alleged in the complaint to have been violated. We have also held that this right is within the narrow area of rights which Congress has constitutional power to protect directly. It is finally necessary to determine whether § 47(3) is so drawn as to be a proper exercise of this constitutional power.

In United States v. Harris, 1882, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290, certain defendants had been indicted for conspiring to deprive certain persons in the custody of a state sheriff of equal protection of the laws by assaulting them, etc. The indictment was under a statute (R.S. § 5519), which described in identical language the conspiracies set forth in the first two clauses of § 47(3) and made such conspiracies a crime without the requirement of acts done in furtherance of the conspiracy, set forth in the last clause of § 47(3).

The statute was struck down because of its breadth. Sec. 5519 provided against the deprivation of "equal protection of the laws, or of equal privileges and immunities under the laws." This provision was broad enough to encompass both federal and state laws and as to state laws Congress was without power to legislate.

In Baldwin v. Franks, 1887, 120 U.S. 678, 7 S.Ct. 656, 659, 32 L.Ed. 766, the Supreme Court held that the provisions of § 5519 were not severable, saying: "A single provision, which makes up the whole section, embraces * * * those who conspire to deprive one of his rights under the laws of a state, and those who conspire to deprive him of his rights under the constitution, laws, or treaties of the United States."

We find within § 47(3) a provision which does not embrace rights under state law. While the language used in § 47(3) is identical with that used in § 5519 from the beginning of § 47(3) to the word "laws" in the eighth line thereof, said § 47(3) then goes on to require that there be an act in furtherance of the conspiracy "whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States." Of course, the provision relative to injury to person or property is subject to the same constitutional infirmity as the Supreme Court found in § 5519. However, that portion of § 47(3) which makes actionable *a deprivation of a right or privilege of a citizen of the United States* relates solely to a federal right and is clearly severable.

We conclude that Congress has the constitutional power to protect against invasion of federal rights by private individuals. Congress has exercised that power by enacting § 47(3). The allegations of the complaint are sufficient to invoke the provisions of said section.

There exists an understandable reluctance to open the doors of federal courts for the redress of grievances inflicted by one set of individuals upon another lest those courts be flooded with actions that should properly be left to the states. We do not think the narrow compass of federally protected rights set up in § 47(3) will permit of such a result. If it does, and the load becomes too burdensome, it then becomes a matter with which the Congress must deal.

Judgment of dismissal reversed.

HEALY, Circuit Judge, Dissenting.

I am in general agreement with the opinion of the trial judge, 80 F.Supp. 501,

although possibly I have approached the case from a different angle.

The statute involved, 8 U.S.C.A. § 47, had its origin in section 2 of the Act of April 20, 1871, 17 Stat. 13, entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." In the Revised Statutes of 1873 [1] section 2 of that Act so far as it provides civil remedies was extensively rearranged and became § 1980. As will later appear, the penal sanction embodied in section 2 was at that time transferred to the title denominated "Crimes." For the moment it is enough to say that 8 U.S.C.A. § 47 is identical in wording, arrangement and subdividing with § 1980. Apparently the clause of subdivision (3) thereof, presently of importance, has been construed in but two cases, Love v. Chandler, 8 Cir., 124 F.2d 785, and Viles v. Symes, 10 Cir., 129 F.2d 828, in both of which it was regarded as giving federal protection against state action only.

Omitting all matter not material to this case, § 47(3) reads: "If two or more persons in any State or Territory conspire [2] * * *., for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

The clause descriptive of the conspiracy forms the heart of this inquiry and therefore merits closer scrutiny than I think my associates have given it. It is notable that the phraseology employed is formal and abstract rather than particular or concrete, whereas the contrary is the case in respect of all other conspiracies outlined in § 47. The crucial verbiage is "for the purpose of *depriving*, either directly or indirectly, any *person* or *class* of persons of the *equal protection of the laws*, or of *equal privileges and immunities under the laws*." The similarity of the verbiage I have italicized to the wording of Section 1 of the Fourteenth Amendment shows that Congress, in choosing its language, was thinking immediately in terms of that Amendment and its vindication.[3] As my associates observe, the congressional debates display a belief (later determined to be erroneous) that the Fourteenth Amendment bestowed on the national government power by legislation to protect the civil rights of persons against individual as well as state invasion; and it is but just to assume that this belief inspired the distinctive language of the clause now under examination. The insuperable difficulty one finds in the way of applying the clause to any action other than such as may be taken under color of state authority seems directly traceable to these circumstances.

We should know now, I believe, that in the constitutional sense it is not within the competence of private persons, whether acting singly or in concert, to *deprive* others of the equal protection of the laws or of equal privileges under the laws. Only action taken under state aegis is capable of effectuating that. Private individuals may conpsire to impede, hinder, interfere with, or interrupt the *free exercise* of a constitutionally protected right or privilege, and it is within their capacity to take effective steps in the furtherance of such

1. Statutes at Large, Vol. 18, p. 348.

2. The portion of the opening clause referring to the going "in disguise on the highway or on the premises of another" is immaterial here, appellants having expressly abandoned any claim of reliance on that phrase.

3. The language of the Amendment is that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State * * deny to any person within its jurisdiction the equal protection of the laws."

a conspiracy. But individual action of this sort can be taken only by conduct violative of state law, such for example as trespass, assault, intimidation, riotous tumult or the enforced dispersal of public assemblages—all of these being wrongs which, in the absence at any rate of suitable federal legislation, the state alone is competent to punish or redress, or by the exercise of its police power to prevent.

That this is so was long ago pointed out by the Supreme Court in the Civil Rights Cases, 109 U.S. 3, 17, 3 S.Ct. 18, 25, 27 L.Ed. 835. The Court said: "The wrongful act of an individual, unsupported by any such [state] authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the state, or not done under state authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the state for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy and sell, to sue in the courts, or to be a witness or a juror; he may, by force or fraud, interfere with the enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow-citizen; but, unless protected in these wrongful acts by some shield of state law or state authority, he cannot destroy or injure the right; he will only render himself amenable to satisfaction or punishment; and amenable therefor to the laws of the state where the wrongful acts are committed. Hence, in all those cases where the constitution seeks to protect the rights of the citizen against discriminative and unjust laws of the state by prohibiting such laws, it is not individual offenses, but abrogation and denial of rights, which it denounces, and for which it clothes the Congress with power to provide a remedy. This abrogation and denial of rights, for which the states were alone or could be responsible, was the great seminal and fundamental wrong which was intended to be remedied."

It will be helpful at this juncture to turn to the case of United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290, from which, curiously enough, my associates appear to derive comfort. As I said earlier, the penal sanction of section 2 of the Act of April 20, 1871, was transferred to the "Crimes" title on adoption of the Revised Statutes. This provision afforded criminal penalties for engaging in conspiracies of the sort described in the section; and in the revision it became § 5519, shown below.[4] It was this section that was before the Court in United States v. Harris, supra, and was there held invalid as being beyond the authority of Congress. My brothers say it was struck down because of its breadth, that is, because it encompassed indiscriminately invasions of state as well as federal rights. This view is superficial and only partially correct. Apparently it is based on the Court's passing approval of the holding in United States v. Reese, 92 U.S. 214, 23 L.Ed. 563. The objectionable sweep of the statute, as I understand the opinion, was by no means the sole or even the major ground upon which its invalidity was predicated.

For the Court to sweep away the statute because the particular offense charged in the case was beyond federal competence seems wholly out of character, like throwing the baby out with the bath. Primarily it appears to have been thought unconstitutional because "directed exclusively against

4. "Sec. 5519. If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premisses of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; each of such persons shall be punished by a fine of not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, not less than six months nor more than six years, or by both such fine and imprisonment."

the action of private persons, without reference to the laws of the states, or their administration by the officers" 106 U.S., at page 640, 1 S.Ct. at page 610. Later in the opinion 106 U.S. at page 643, 1 S.Ct. at page 612, the Court remarked that if Congress has power to punish a conspiracy of this character, it can punish the act itself whether done by one or more persons. "A private person", said the Court, "cannot make constitutions or laws, nor can he with authority construe them, nor can he administer or execute them. The only way, therefore, in which one private person can deprive another of the equal protection of the laws is by the commission of some offense against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault, or murder", all of which were thought to be offenses solely within state competence. In this passage one discerns the embryo of the philosophy much more adequately developed in the Civil Rights Cases, supra. Clearly, the Harris decision renders highly dubious even the constitutionality of the statute before us.

My brothers rely extensively on the judicial history of 18 U.S.C.A. § 241 (formerly 18 U.S.C.A. § 51, Rev.Statutes § 5508). Similarly in the brief of appellants, as well as in those of the several organizations appearing amici curiae, that statute is lugged in as representing the "criminal counterpart" of the statute under inquiry. The section is quoted on the margin.5 Its validity has been upheld by the Supreme Court and its provisions several times applied to private conspiracies. The cases applying it will be reviewed shortly. For the moment I desire to call attention to the fact that the statute is not at all a counterpart of the one here invoked. In fitting language it describes a conspiracy which private individuals are perfectly capable of conceiving and effecting, namely, a conspiracy to "injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." 6 This verbiage may conceivably be regarded as descriptive of what the appellees in this case appear actually to have done and conspired to do, but since the statute provides no civil remedy in damages it necessarily affords no ground for federal jurisdiction here.

The cases in which § 241, supra, was applied reveal the Court's deep preoccupation with the necessity of the national government's protecting itself, its institutions, officers, and services from interference through individual misconduct. The first of the group, Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 157, 27 L.Ed. 274, involved a charge that the defendants had conspired to intimidate a citizen of African descent in the free exercise of his right to vote for a member of Congress, and in the execution of the conspiracy had beaten and wounded him. The Court said that it is the duty of the United States to see that the citizen may exercise this right freely, and to protect him from violence while so doing, or on account of so doing. "This duty," said the Court, "does not arise solely from the interest of the party concerned, but from the necessity of the government itself, that its service shall be free from the adverse influence of force and fraud practiced on its agents, and that the votes by

5. "§ 241. Conspiracy against rights of citizens.
"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—
"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."
This statute derives from the Act of May 31, 1870, 16 Stat. 141.

6. This statute should be compared with 18 U.S.C.A. § 242, relating to the "deprivation" of rights under color of state law or custom. The switch in congressional verbiage when dealing with state action is of obvious significance.

318

which its members of congress and its president are elected shall be the *free* votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice." The same insistent note of concern for the integrity of the functions and processes of the national government runs through all the cases arising under that section.[7]

While the problem had better be left to be dealt with when it is presented, I may for present purposes assume that the criminal statute on which all but one of the foregoing cases proceed, namely § 241, supra, would reach a conspiracy having substantially the object of interfering with the exercise of the right of citizens to assemble for the purpose of discussing national affairs or of petitioning Congress for the redress of grievances.[8] There is dicta in United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588, supporting that view, although the actual holding was that no offense under the statute was discernible in the indictment, which charged that the defendants conspired to hinder named citizens of the United States (negroes) in the free exercise and enjoyment of their "lawful right and privilege to peaceably assemble * * * for a peaceful and lawful purpose." The right of the people to assemble for any lawful purpose was thought to be an attribute of the citizens of any free government and did not derive

from the federal constitution. For their protection in its enjoyment, therefore, it was said that the people must look to the states.

I return now to the case immediately before us. The majority opinion gives to the instant statute no more than cursory attention, quoting it at the outset in a footnote but thereafter ignoring its distinctive wording. The clause descriptive of the conspiracy is treated as though it said something widely different from what it does say or means something other than it says. The conspiracy alleged is referred to as one to "interfere with" or "break up" a meeting being held for the purpose of discussing and petitioning Congress in respect to the Marshall plan; and the question presented is discussed as though the conspiracy clause were couched in language substantially identical with the clause found in 18 U.S.C.A. § 241, supra. The primary effort of the majority is devoted to proving their point that Congress, although purportedly legislating in support of the Fourteenth Amendment, was aiming at private rather than state action—a proposition with which I am not necessarily in disagreement. But their absorption in that effort has led them, I think, to overlook the circumstance that Congress succeeded only in providing redress for conduct of which individuals are in the nature of things incapable except when acting under color of state authority. Thus by a species

7. In re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080, the charge was that the defendants conspired to injure and oppress one Worley for having reported to a United States deputy marshal that certain individuals had violated the internal revenue laws by carrying on illicitly the business of a distiller. In Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429, the conspiracy charged was to do violence to certain individuals while in the custody of a United States deputy marshal, who was holding them to answer for a federal offense. United States v. Waddell, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673, involved the right of a citizen to be protected against enforced removal by others from public land on which he had made a homestead entry, where it was requisite

that he continue his residence to perfect his entry. Crandall v. Nevada, 6 Wall. 35, 73 U.S. 35, 18 L.Ed. 744, although decided prior to the adoption of these statutes, proceeds on the same strain. It had to do with a state law exacting a tax on all persons entering or leaving the state. The statute was held invalid on the broad ground of the right and necessity of the people being left free to travel to the seat of the national government, to the seaports, and to the land offices and other agencies of the United States distributed widely throughout the country.

8. Cf., however, Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330; Williams v. United States, 5 Cir., 179 F.2d 644.

of unconscious judicial legislation they have rewritten the clause to make it conform to what they believe to have been the legislative intent.

In the infinite multiplicity of public meetings held in this country nowadays there are few that fail to concern themselves in one way or another with national affairs. If the loosely casual interpretation the majority have given this special statute is to prevail, the federal government through its courts will from now on be under the necessity of policing political meetings throughout the whole of the forty-eight states. There are many and various ways of interfering with and interrupting such meetings when, as has frequently happened in the course of our history, individuals of violently opposed opinion really set their minds to it. A little clique in the gallery, for example, may by concerted jeers and catcalls, the heckling of speakers, or the making of loud and unseemly noises, disrupt partisan gatherings as effectively as can be done by direct action. And the picketing of public assemblages, now so freely practiced, is a calculated and often effective means of frightening the timid into remaining away altogether.

It seems to me therefore that my brothers, although protesting the contrary, have by their undiscriminating appraisal of this long dormant act opened wide the gates to federal intervention in a field heretofore thought solely within the competence of the states. For my part, out of respect at least for our dual system, which the federal courts have traditionally been vigilant to preserve, I would postpone the intervention until such time as Congress has by clear and fitting legislation made that course unavoidable. Meantime I would not, by federal exertion of a dubious power, water down or discourage the local sense of responsibility for the policing and protection of public assemblages.

I need not review the allegations of the pleading thought insufficient below to confer federal jurisdiction. That task has already been performed by the trial judge. In his analysis of the factual aspects of the complaint he has revealed this case to be the transparent sham it is when read against the actual wording of the statute. Here, as his discussion shows, a sporadic incident of transient interference with the exercise of a right is by the ingenuity of counsel dressed up in grave constitutional attire and pointed to as a "deprivation" of the right.

Judges are apt to be naive men, as Justice Holmes is reported as remarking, but they are not, I hope, so ingenuous as to be oblivious of the world about them. This incident occurred in La Crescenta, a sizeable suburb of the City of Los Angeles. One hardly need say that the Los Angeles community is justly celebrated for its tolerance of all sorts and conditions of people and ideas. The hospitality of the community embraces not merely the conformist, the respectable and the truly good, but the proponents of practically every ism under the sun. Presumably, and so far as appears from appellants' pleading, La Crescenta has a police force able and willing to protect peaceful assemblies of all comers from intrusion or violence. The club whose members are complaining of the disruption of their meeting had but to call on the police to eject this handful of intruders, and if a repetition of the intrusion were anticipated at future meetings they need only have asked the local authorities for protection from it. No substantial deprival by private action of the right of assembly and petition is possible in such an atmosphere, no matter whose lexicon is taken as the standard. Moreover the laws of the State of California provide means of redress, civil and criminal, for whatever wrongs were done in this instance. If for no more compelling reason, the dismissal of the case was justified for lack of a substantial federal question.

The judgment should be affirmed.