# THE CORPORATION OF GEORGETOWN
## *vs.*
## JOHN B. DAVIDSON.

1. The ordinance of Georgetown of July 24, 1852, providing for the inspection of flour does not apply to such flour as is merely in transit through the city, as, for example, where it is shipped from a point in Maryland to the City of New York, and passes through Georgetown on its way to the point of destination.
2. If the ordinance were intended to apply to such cases it would be unconstitutional as an attempt to regulate commerce between the States.

At Law No. 4776.  Decided November 3, 1868.

APPEAL from a judgment of a justice of the peace.  Certified to the General Term for hearing in the first instance.

The plaintiff, Davidson, was the agent of the Washington and New York Steamship Company.  In that capacity he received at Georgetown a quantity of flour consigned by certain parties in Washington County, Maryland, to certain parties in New York City, and shipped by canal to Georgetown, there to be transferred to the vessels of said New York Steamship Company to be transported to New York.

The flour so received by Davidson was consigned through to the consignees in New York, and was in Georgetown *in transitu* only and not for the purpose of use or sale in that place.

Whilst the flour was thus in Georgetown the corporation flour inspector demanded the right to inspect the same.

Davidson informed the inspector that the flour was consigned through to New York from Washington County, Md., and was in Georgetown *in transitu* only, and refused to allow him to inspect it.

Davidson then put the flour on board a vessel of the New York Steamship Company, to be shipped to the consignees, and it was transported to New York, and there delivered, according to the terms of the original consignment.

Thereupon a proceeding was instituted before a justice of the peace by the corporation of Georgetown against the plaintiff, and he was fined ten dollars for violating the ordinance of July 24, 1852.

The following are the sections of the ordinance under which the proceedings were instituted.

Sec. 7. And be it further ordained, that all and every barrel and half barrel of flour manufactured within this town, or brought to the same for *sale, shipment or exportation,* shall be subject to the examination of the inspector, by boring, searching, and trying it through with an instrument, not exceeding five-eighths of an inch in diameter, to be provided by the inspector for that purpose, who shall afterwards plug up the hole with a round plug made of soft wood, so as to prevent the entrance of water, and if the inspector shall judge the same to be merchantable, according to the directions of this ordinance, he shall at the time of inspecting, mark or brand on the head of every barrel or half barrel of flour, in letters one half an inch in length, the word "GEORGETOWN," together with a word or words designating the degree of fineness which he shall at the time of inspection determine said flour entitled to, with the exception of the degree *superfine,* which he shall mark or brand over the quarter, and the several degrees in quality shall be distinguished as follows, viz, family, superfine, fine, first and second middling, for the inspection of which the said inspector shall have and receive of the owner or agent for each and every barrel and half barrel one cent, and every barrel and half barrel of flour which shall prove on examination thereof to be unmerchantable, according to the true intent and meaning of this ordinance, the said inspector shall mark on the head with a broad arrow; and no barrel

or half barrel of flour not examined and branded or marked by the inspector as aforesaid, family, superfine, fine, first or second middlings, or marked with a broad arrow, shall be sold within this town, or shipped, or exported from the port of Georgetown, under a penalty of one dollar for every barrel or half barrel, to be paid by the person or persons so offending.

Sec. 14. And be it further ordained that if any seller, owner, agent, or other person shall prevent the inspector from exercising the duties enjoined on him by this ordinance, he or they shall forfeit and pay for every such offense the sum of $10.

Sec. 15. And be it further ordained, and it is hereby declared to be the true meaning of this ordinance, that every barrel and half barrel of flour manufactured within this town, as well as every barrel and half barrel of flour brought to the same, whether for sale, shipment or exportation shall be inspected by the inspector as aforesaid.

Mr. R. T. Merrick, for plaintiff:

I. The ordinance of Georgetown directing the inspection of flour which may be in said town *in transitu only,* and the imposition of a tax upon the owner or agent thereof, to pay for such inspection is unconstitutional and void. The passenger Cases, 7 How., 284; Gibbons *vs.* Ogden, 9 Wheat., 200; Brown *vs.* Maryland, 12 Wheat., 419, 443.

II. The ordinance cannot be defended as belonging to the class of *inspection laws,* recognized by the Supreme Court as within the legislative power of the several States. Such laws relate exclusively to articles manufactured within the State for exportation or domestic use or brought to the State for sale and use within its limits. Story, sec. 1017; Gibbons *vs.* Ogden, 9 Wheat., 203; Hancock *vs.* Sturgis, 13 John, 331.

III. The people of the United States constitute one nation, and have the right to go from one part of that nation

to another and engage in commerce between its various sections without thereby subjecting themselves or their property to taxation by the States or municipalities through which they may find it necessary to pass. Story, sec. 1066; Crandall *vs.* The State of Nevada, 6 Wallace, 43; Steamship Company *vs.* Portwardens, 6 Wallace, 31; Federalist, No. 42.

Mr. C. M. Matthews, for the corporation of Georgetown:

The law is perfectly constitutional. It is not a regulation of commerce within the meaning of the Constitution. It is a mere inspection law, designed to preserve the local character of Georgetown flour in foreign markets; and such laws have always been recognized by the Supreme Court as not interfering with the constitutional perogative of Congress to regulate commerce.

But even if it is a regulation of commerce, Congress in granting a charter to Georgetown which authorized that municipality to provide for the inspection of flour, has given Georgetown the power to make such regulations of commerce as may be necessary to secure such inspection, by penalties or otherwise. The fact that the inspection laws and the inspection fees of Georgetown are the same upon persons residing outside, and upon residents of the city, shows that the only design of the law is to secure the purity of the article inspected, and thus that the law is merely such an inspection law as the Court has often decided to be constitutional.

Mr. Chief Justice Cartter delivered the opinion of the Court:

This case comes here on appeal from a judgment of a justice of the peace of Georgetown, to the Circuit Court, by which Court it has been certified to this Court for a hearing in the first instance. The appeal is from the decision of a magistrate of Georgetown inflicting a penalty of $10 for the violation of a corporation ordinance.

*36*

(The ordinance, which is given in the foregoing statement of the case, was then read by the Court.)

The facts, as settled by the parties, are as follows, to wit: "The flour in question, which was claimed as the legal subject of inspection, was manufactured at Weverton, Md., by Geo. H. McClure & Co., and consigned to John J. Marvin, New York City.

"The flour was received by J. B. Davidson, as the agent of the New York and Washington Steamship Company, and forwarded by him on board the steamship Valley City to John J. Marvin, to whom it was consigned. It was taken from the canal boat at the wharf of George Water's in Georgetown, D. C., and hauled from there in drays a distance of a little over one square to the wharf of said company, the said Davidson paying canal freight and drayage to their wharf and charging the same in the bill of lading from Georgetown to New York. While the flour was on the wharf of the steamship company, J. D. Robinson, the inspector of flour for Georgetown, D. C., demanded the right to inspect the same, and was notified by said Jno. B. Davidson that it belonged to J. H. Meixell, of Baltimore, and was to be carried over to New York as per bill of lading first referred to, and that he could not inspect the same. The flour was forwarded as per consignment above, without inspection. The said steamboat company is a common carrier from Georgetown to New York and intermediate points."

From this statement of the facts of the case it appears that the flour which is made the occasion of this controversy was owned by a citizen of Maryland, and by him manufactured in the mills of Maryland; that it was exported from its place of manufacture in Maryland under ultimate consignment to New York; that it pursued its transit from Washington County, Md., through the highways, and by the means chosen for its transportation, regularly and uninterruptedly until it reached its destination.

The first stage of its journey was in a canal boat upon the Chesapeake and Ohio Canal to Georgetown, then by drays over a brief carriage through Georgetown to the steamship, which continued its transportation down the Potomac River, Chesapeake Bay, and along the coast to New York City.

In the light of these facts it is claimed by the plaintiff that the shipment of the flour into and out of Georgetown brought it within the provisions of the ordinance providing for the inspection of flour within the city, making Davidson, who refused its inspection, answerable to the penalty of the ordinance. If the Court are to regard the ordinance in the literal signification of its language uncontrolled by its proper object and legal province, there would be an end to the inquiry, for the flour in controversy was literally shipped out of the city of Georgetown.

But is the term " shipment " entitled to a literal signification in connection with the subject under consideration? This question is to be answered under the light of the law and the facts. The City of Georgetown is a municipality of limited authority. In the enactment of the ordinance in question it exercised its municipal legislative power; and as we are compelled to infer, for municipal purposes. It legislated for the people, and within the jurisdiction of Georgetown. The subject of its legislation in this respect has been uniformly regarded by judicial authority as the subject of municipal power, limited to the territory of the municipality and the people within it, and never suffered to have extra-territorial effect. By all the authorities it is asserted that the purpose and latitude of inspection laws are to protect the citizens of a State or municipality in their credit as to the quality of the article which they may export, as the product of their own manufacture or production, or to protect the people of a State or municipality against imposition in the quality of what may be imported and con-

sumed by the people of the State or municipality. The right to interpose inspection laws is in no regard a right to regulate commerce, but a right which relates to the domestic economy and health of the people enacting it, and not strangers under a different government—a right which ceases when commerce removes the subject of inspection from the jurisdiction of the power imposing the inspection, a right which begins when commerce has terminated its office in delivering the subject of inspection up to the uses of the people imposing the inspection.

If we read this ordinance, therefore, in the light of its sphere of operation, the rational interpretation of the term "shipment" in it, is shipment of flour that in some form had been identified with the interest of Georgetown. The flour in question sustained no such relation to Georgetown or its inhabitants. The wheat from which it was made was probably grown in Maryland. It is admitted to have been manufactured and owned there and contracted to be sold in the City of New York. The only relation that Georgetown or its inhabitants sustained to it was the occupation of a few rods of ground across the highway of its transit, situated at the head of tidewater navigation and at the foot of the Chesapeake and Ohio Canal. The shipment in this instance, therefore, was in no sense a shipment from Georgetown, but a shipment through Georgetown, which begun in Maryland and terminated in New York City.

We are forced to these conclusions, notwithstanding the decision in the case of the Commonwealth vs. King et al, in the Supreme Court of Pennsylvania. That case, in its conclusion, is in conflict with these views; not in the consideration of the legal principles that should govern the question, but in the construction given to the act of breaking bulk and reshipping in the port of Philadelphia. The learned Court in the case referred to makes the act of reshipment equivalent to an act of exportation, which would

seem to be sacrificing substance to shadow, subjecting the purpose and action of the parties to the manner and mode in which the purpose and act of the parties are executed. In fact, we are informed by this very case at its conclusion that the statute upon which the opinion was founded was so repugnant to the dictates of justice and the fraternity of the States that the Legislature repealed the act the day before the case went into judgment.

The Supreme Court of the State of New York in the case of Hancock *vs.* Sturgess, 13 Johns., 331, hold the contrary. In 'that case they decided that flour shipped under the same circumstances was to be esteemed *in transitu* and upon the highway. If the case stopped here the Court would be compelled to hold that the flour in question was not shipped from Georgetown within the legal signification of the term " ship " as provided in the ordinance. But, conceding that it was, it behooves the Court to inquire by what authority the City of Georgetown undertakes to legislate for the citizen of Maryland and New York.

As I have already had occasion to remark, the predicate of authority for the passage of inspection laws is that something is about to be exported from or consumed in the jurisdiction where they operate. The flour in question was shipped in Maryland by a citizen of Maryland to a citizen of New York. It had no destination in Georgetown, nor did its shipment contemplate any transfer to a citizen of Georgetown. The only office performed within Georgetown by any person of Georgetown was the office of a common carrier. The parties of Maryland and New York used the drays of Georgetown, and perhaps a citizen of Georgetown to transport the flour from the canal to the river under the unquestioned right to the use of the highway for that purpose. In the relations of this flour to Georgetown a toll gate would be a much more pertinent mode of taxation

than an inspection, if the authorities wished to levy taxation upon merchandise in transit.

By article first, section eight, of the Constitution, the power to regulate commerce among the several States, is given in express terms to Congress, and the States are expressly prohibited from laying duties on imports or exports in executing the inspection laws. This power, thus given to Congress, is essentially and necessarily an exclusive power, created, as we learn from the *Federalist,* in a paper contributed by James Madison, to cure the evils which experience had detected in the relation of the colonies under the articles of confederation—a power vested in Congress to avoid the obstructions to inter-state commerce so clearly exemplified in the case we have before us. To assume that this case is under the operation of the ordinance of the City of Georgetown, and that Georgetown had a right and authority to create the ordinance, would be to assume that the power vested by the Constitution in Congress resides in the City of Georgetown, with the right to regulate the commercial relations of Maryland and New York, for the effect of the ordinance is to say that they shall not trade with each other in flour, through the Chesapeake and Ohio Canal and the Potomac River, except upon the condition of permitting the levy of an inspection duty.

If any one proposition was better settled than any other by the people of the United States in the adoption of their constitution, which transformed their relations from a confederated into a national character, it is the proposition that the commercial intercourse between the States and all the States should be free, and delivered up to the exclusive regulation of the Federal legislative power, thus placing the right of inter-State commerce beyond the reach of interruption or imposition on the part of any interposing State, and making each and every State of the union contiguous, however re-

mote from each other they might be in their geographical positions.

We do not, therefore, think the ordinance capable of the construction claimed for it by the plaintiff; but if it is capable of that construction, we are still constrained to the opinion that it is inoperative and void, not only by the irresistible logic that brings us to that result, but by the spirit of the decisions of the Supreme Court in all the cases involving the question of the commercial relations of the States, and the rights in that regard of the citizens of the United States from the case of Gibbons *vs.* Ogden, 9 Wheat., 203, to the case of Crandall *vs.* The State of Nevada, 6 Wall., 43.

*Judgment reversed.*