

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00589-CV

**IN THE INTEREST OF M.T.**, a Child

From the 365th Judicial District Court, Maverick County, Texas
Trial Court No. 17-09-34741-MCVAJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:    Rebeca C. Martinez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: August 19, 2020

AFFIRMED

This is an appeal from a divorce proceeding between T.T. ("Father") and F.T. ("Mother"). In its final divorce decree, the trial court granted Mother the exclusive right to designate the primary residence of the parties' child within 300 miles of Eagle Pass, Texas. In six issues, Mother challenges the imposition of a geographic restriction on her right to designate the child's primary residence. We affirm the trial court's order.

### BACKGROUND

Father and Mother were married on April 13, 2013. Their child, M.T., was born on January 13, 2017. In August 2017, Mother left the marital home in Eagle Pass, Texas and moved to San Diego, California with M.T. Father filed for divorce on September 7, 2017, and Mother filed a counterpetition for divorce on October 25, 2017.

Thereafter, the parties reached an agreement on several issues concerning the divorce, the distribution of the property, and the custody of the child. Specifically, Father and Mother agreed that both parents would be designated joint managing conservators and that Mother would have the exclusive right to designate the primary residence of the child. The only contested issue was whether a geographic restriction would be imposed on Mother's exclusive right to designate the primary residence of the child. Father requested a geographic residency restriction within 180 miles of Maverick County, Texas, which Mother opposed.

A jury trial was conducted, with both parties presenting evidence on the issue. At the conclusion of the evidence, the trial court charged the jury with two questions: (1) whether Mother should be permitted to designate M.T.'s primary residence without a geographic restriction or with a geographic restriction; and (2) if with a geographic restriction, the geographic area within which Mother must designate M.T.'s primary residence. The jury answered the first question "with geographic restriction," and based on that answer, determined in response to the second question that Mother must designate M.T.'s primary residence within 300 miles of Eagle Pass, Texas. In its final divorce decree, the trial court rendered judgment in accordance with the jury's verdict, and this appeal followed.

## DISCUSSION

Father argues Mother has waived her arguments on appeal due to inadequate briefing. Rule 38.1(i) of the Texas Rules of Appellate Procedure requires that an appellant's brief contain clear and concise arguments for the contentions made, including appropriate citations to authorities and to the appellate record. TEX. R. APP. P. 38.1(i). Although we interpret this requirement reasonably and liberally, "a party asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law support its contentions." *Gadekar v. Zankar*, No. 12-16-00209-CV, 2018 WL 2440393, at *5 (Tex. App.—Tyler May 31, 2018, no pet.) (mem. op.).

We have "no duty—or even right—to perform an independent review of the record and applicable law to determine whether there was error." *Id.* "Were we to do so, we would be abandoning our role as neutral adjudicators and become an advocate for that party." *Id.* Accordingly, a party's failure to cite to the appellate record, to provide citations to relevant legal authority, or to conduct a substantive analysis of the legal issue presented results in waiver of the party's appellate complaint. *See id.*; *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.).

In her brief, Mother presents six arguments in support of her contention that the imposition of a geographic restriction on her right to designate M.T.'s primary residence was erroneous. In her first complaint, Mother contends: "By including the geographic restriction in its Final Decree, the district court created grounds for [Father] to seek an order of enforcement that would compel [Mother] to leave her well-paying job in California and move to the state of Texas without the immediate prospect of employment and without the support and comfort of her life-long network of family and friends." In her second complaint, Mother contends: "[T]he geographic restriction in this case is unenforceable as a practical matter given the fact that no Texas court has powers of enforcement across state lines that would enable it to compel a California resident to forfeit her job, abandon her home and move to Texas with her infant child." In her third complaint, Mother contends the trial court's final decree is void because it contains contradictory terms. Mother does not provide any substantive legal analysis in support of these allegations, nor does she cite to any legal authorities or to the appellate record. Accordingly, we hold Mother has waived these complaints on appeal. *See Sweed v. City of El Paso*, 195 S.W.3d 784, 786 (Tex. App.—El Paso 2006, no pet.) ("An issue on appeal unsupported by argument or citation to legal authority presents nothing for the court to review.").

In her fourth complaint, Mother contends the geographic restriction is unconstitutional because it violates her constitutional right to freedom of movement and her right to live where she

chooses. Mother cites *Crandall v. Nevada*, 73 U.S. 35 (1867) to support her contention that "a state cannot take action inhibiting people from leaving a state at their will." Therefore, Mother argues, "a state court cannot use its judicial power to force a person to change their permanent residence from one state to another." In *Crandall*, the Supreme Court held that the State of Nevada could not impose a tax on residents who wish to leave the State or on nonresidents merely passing through the State because "all citizens of the United States . . . must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Id.* at 49. Beyond her cursory statements, Mother fails to provide any substantive analysis explaining how or why the legal principles articulated in *Crandall* support her claim. Lastly, Mother cites to the Fair Housing Act as support for her contention that she cannot be denied the right to live where she chooses. *See generally* 42 U.S.C. § 3601 (declaring the stated purpose of the Act is "to provide, within constitutional limitations, for fair housing throughout the United States"). Mother fails to explain how the Fair Housing Act is relevant to the facts of her case. We find *Crandall* and the Fair Housing Act inapplicable here. Because Mother has failed to provide any substantive legal analysis and has failed to cite to any applicable legal authority in support of her constitutional claim, she has presented nothing for us to review on this issue. *See Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). Accordingly, we hold Mother has waived this complaint on appeal.

In her fifth complaint, Mother contends that the geographic residency restriction is "unreasonable," in part, because it is not based on legally sufficient evidence. In her sixth complaint, titled "case law," Mother cites to various cases in which the reviewing court determined that the imposition or modification of a geographic residency restriction was not in the child's best interest. We construe these complaints together as a challenge to the legal sufficiency of the

evidence supporting the jury's finding that a geographic residency restriction within 300 miles of Eagle Pass, Texas was in M.T.'s best interest.

Texas Family Code section 105.002 permits jury trials in most suits affecting the parent-child relationship. *See* TEX. FAM. CODE ANN. § 105.002(a). In a jury trial for a suit affecting the parent-child relationship, a party is entitled to a verdict by the jury on the issues of:

> (E) the determination of whether to impose a restriction on the geographic area in which a joint managing conservator may designate the child's primary residence; and
>
> (F) if a restriction described by Paragraph (E) is imposed, the determination of the geographic area within which the joint managing conservator must designate the child's primary residence[.]

*Id.* § 105.002(c)(1)(E)–(F). The trial court may not contravene the jury's verdict on these issues. *Id.* § 105.002(c)(1). Therefore, on appeal, the jury's verdict is reviewed for legal sufficiency. *See Lenz v. Lenz*, 79 S.W.3d 10, 16 (Tex. 2012) (reviewing jury's verdict on geographic residency restriction for legal sufficiency).[1]

In conducting a legal sufficiency review, we view the evidence in the light most favorable to the jury's verdict and indulge every reasonable inference in its favor, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). "If there is more than a scintilla of evidence to support the [jury's] finding, we must overrule the legal sufficiency challenge." *RE/MAX of Tex., Inc. v. Katar Corp.*, 961 S.W.2d 324, 326 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level

---

[1] Mother "submit[ted] this appeal for review under the abuse of discretion standard." A trial court's decision regarding conservatorship is reviewed under an abuse of discretion standard. *Morgan v. Morgan*, 254 S.W.3d 485, 487 (Tex. App.—Beaumont 2008, no pet.). However, here, we are reviewing a jury's findings regarding conservatorship. Accordingly, legal sufficiency is the proper standard of review. *See Lenz*, 79 S.W.3d at 16 (noting the court's "analytical framework" was different for a review of a jury's decision than for a review of a trial court's determination); *Alexander v. Rogers*, 247 S.W.3d 757, 761 (Tex. App.—Dallas 2008, no pet.) ("[A] jury's findings underlying a conservatorship decision are subject to ordinary legal and factual sufficiency review.").

that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citations omitted). Ultimately, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. In our review of the evidence, we are mindful that the "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *Id.* at 819. We may not substitute our judgment for that of the jury. *Id.* at 822.

In determining conservatorship and possession of and access to the child, the best interest of the child is the primary consideration. TEX. FAM. CODE ANN. § 153.002. In assessing whether a geographic residency restriction is in the best interest of the child, the public policy of Texas guides our analysis. *See Lenz*, 79 S.W.3d at 14; *Cruz v. Cruz*, No. 04-17-00594-CV, 2018 WL 6793847, at *2 (Tex. App.—San Antonio Dec. 27, 2018, no pet.) (mem. op.). Section 153.001 provides that the public policy of Texas is to:

> (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
>
> (2) provide a safe, stable, and nonviolent environment for the child; and
>
> (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

TEX. FAM. CODE ANN. § 153.001(a)(1)–(3). "Suits affecting the parent-child relationship are intensely fact-driven" and, thus, "no bright-line test can be formulated." *Lenz*, 79 S.W.3d at 19. Instead, a court may balance and consider the following non-exclusive factors when considering the best interest of the child in the context of geographic residency restrictions:

> (1) the reasons for and against the move; (2) the effect on extended family relationships; (3) the effect on visitation and communication with the non-custodial parent to maintain a full and continuous relationship with the child; (4) the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the non-custodial parent and child; and (5) the nature of the

child's existing contact with both parents, and the child's age, community ties, and health and educational needs.

*Morgan*, 254 S.W.3d at 488 (citing *Lenz*, 79 S.W.3d at 15–17). Therefore, in reviewing the legal sufficiency of the evidence in support of the jury's verdict to impose a geographic residency restriction within 300 miles of Eagle Pass, Texas, we consider "the evidence produced relevant to the best-interest factors in a light that tends to support the jury's verdict." *Lenz*, 79 S.W.3d at 17.

*Reasons for and against the move*

In 2016, Mother and Father moved to Eagle Pass, Texas and lived together in their marital home. Their child, M.T., was born on January 13, 2017. On or about August 9, 2017, Father was notified that his mother was in intensive care in the hospital in Annapolis, Maryland. Father drove to Annapolis to be with his mother and Mother stayed behind because she and M.T. were feeling ill. Unbeknownst to Father, Mother had planned to leave the marital home and had arranged for her father, stepmother, and uncle to pick her and M.T. up from their home in Eagle Pass, Texas and move them to San Diego, California. On or about August 14, 2017, Father returned home to Eagle Pass and discovered that Mother, M.T., and their belongings were gone. It is undisputed that Father was unaware of Mother's plans to leave the marital home in Eagle Pass and move to San Diego with M.T.

Mother claimed she moved to San Diego because Father became emotionally abusive towards her and that, on two separate occasions, Father pushed her and hit her on the back of her head with his cell phone. Mother also claimed that Father began abusing alcohol. Father denied ever being emotionally or physically abusive towards Mother. Father admitted to drinking an alcoholic beverage on occasion, but he denied that he was abusing alcohol. Father alleged Mother had physically assaulted him on two separate occasions before they were married. Mother denied the allegations. A social study was conducted on Father, Mother, and M.T. by a court-appointed

evaluator. The evaluator testified at trial and her social study report was admitted as evidence. The evaluator reported that she had found nothing to substantiate Mother's and Father's abuse allegations and nothing to substantiate Mother's allegations that Father had a drinking problem.

Mother wants to remain in San Diego because her support system is in California. Mother and M.T. currently live in La Mesa, California with her best friend, her best friend's husband, and her best friend's four-year-old son. Mother does not pay rent and, instead, acts as a nanny to her best friend's son. Mother stated she has thought about getting a place of her own, but, as of now, her best friend loves having her there, and M.T. and her best friend's son "are like brothers."

Mother has a bachelor's degree in child and family development and a master's degree in finance. Mother is employed at Northwestern Mutual as a financial planner. The position is commission based. Though her monthly income fluctuates, Mother estimated she made about $3,000 in July 2018. Mother testified that she recently received a job offer from the Department of the Navy in San Diego and that the starting salary is $59,604. Mother acknowledged that it was a tentative offer that had not been finalized yet and that she must also pass various background and security checks before being officially hired. Mother stated she did not believe there were many employment opportunities in her field in Eagle Pass because she is not bilingual. When asked if she had looked for employment in Eagle Pass, San Antonio, or the surrounding areas, Mother stated she had not. Father alleged that Mother had previously been offered a finance position with USAA in San Antonio, Texas, but Mother claims that is not true.

Mother agrees that it is important for Father to have a relationship with M.T., but feels it is best if Father moved to San Diego to be near her and M.T. Mother stated Father's job could transfer him to San Diego or a nearby area. Father is employed with Customs and Border Protection in the office of Professional Responsibility as a special agent in Del Rio, Texas. Father's monthly gross income is $6,189. Father and Justin Hargis, Father's coworker, testified

that their job does not give them the ability to transfer. Father testified that he has no plans to relocate or leave Eagle Pass. When asked why he requested a geographic restriction, Father stated:

> I want to be in [M.T.'s] life. I want him to be close. I want to play a role in being his dad, and I don't know how that's going to be in California. [Mother] is in California now and I don't get to see him. He needs to have a dad. She has friends there, that's great, but he needs a dad.

The evaluator agreed that Mother had family support in California and had obtained a good job; however, the evaluator reasoned that it was in M.T.'s best interest to have consistent access to both of his parents. The evaluator opined that M.T. had a right to be raised by both Mother and Father and, thus, it was in M.T.'s best interest to have his parents in close proximity to each other so that M.T. had the opportunity to grow up with both of them in his life. Ultimately, the evaluator recommended that a geographic restriction within 180 miles of Del Rio, Texas be imposed on Mother's exclusive right to designate M.T.'s primary residence.

*The effect on extended family relationships*

Mother has a close relationship with her stepmother, her aunt, and her uncle, all of whom live near her best friend's home in La Mesa, California. Mother also had a close relationship with her father, who passed away shortly before trial. Mother stated that her late father and stepmother helped her out financially after she moved to California and provided her with a vehicle to use. According to Mother, M.T. and her best friend's son play together, love each other, and "are like brothers."

*The effect on visitation and communication with the non-custodial parent to maintain a full and continuous relationship with the child*

Father stated that a month after Mother left Eagle Pass, he removed Mother from his phone plan and disconnected her phone. Thereafter, according to Father, Mother refused to give him her new phone number or address in San Diego until February 2018. Father stated that Mother has

been difficult to talk to and, when they do talk, it often leads to a verbal argument. Father has only seen M.T. through Facetime[2] "a little" and through pictures Mother placed in an online account. Father has sent M.T. gifts, but he does not know if M.T. has received them. From the time Mother left in August 2017 to the time of trial, Father had not had in-person contact with M.T. Father testified that he attempted to see M.T., but that Mother only offered Facetime as an option. Father stated he felt his only option was to "let this play out through court."

Mother testified that she had told Father that he could come to San Diego and see M.T. anytime he pleased, but that he had not done so. Mother stated she had not offered to assist Father with any visits or travel expenses to San Diego because she lacked the means. Mother testified that Father had the opportunity to Facetime M.T., but that Father initiated Facetime with M.T. "very sporadically." Mother acknowledged that Father had not had the opportunity to witness many of M.T.'s milestones, such as his first crawl, his first steps, and his first words.

*The possibility of a visitation schedule allowing the continuation of a meaningful relationship between the non-custodial parent and child*

Mother agreed that it is important for Father to have a relationship with M.T. Mother testified that Father could visit M.T. in San Diego as often as he likes, that she would assist Father with his travel expenses, and that she would continue to use Facetime whenever Father wanted. Mother stated she would be willing to fly with M.T. to Eagle Pass on a regular basis to facilitate visits with Father, though she admitted that she not had not offered to travel to Eagle Pass before. Mother approximated that a drive from San Diego to Eagle Pass would take seventeen hours and, when questioned by opposing counsel, Mother agreed that she would not want M.T. driving seventeen hours, each way, each time M.T. visited Father.

---

[2] Facetime is a video phone call service.

The evaluator opined that Father needed to have consistent contact with M.T. in order for Father to build a relationship with M.T., but the practicality of that happening with M.T. in San Diego would be difficult. The evaluator testified that the cost of traveling between Eagle Pass and San Diego would also make it financially difficult on Mother and Father. In her report, the evaluator stated she did "not see how [Father] could have frequent and continuing contact with [M.T.]" and that "it [would] be difficult if not impossible for [Father] to share in the rights and duties of raising M.T." if the child resided in California.

*The nature of the child's existing contact with both parents, and the child's age, community ties, and health and educational needs*

M.T. was approximately seven months old when Mother left for San Diego. Mother testified that, during the first seven months of M.T.'s life, Father was uninvolved and not supportive. According to Mother, Father would only hold M.T. for short periods of time, would not help with changing M.T.'s diapers, and would not help feed M.T. during the night. Father denied that he was uninvolved or unsupportive. Father stated he would play with M.T., would hold him when he could, and would watch M.T. whenever Mother needed help. He attended every doctor's appointment and watched a number of parenting videos. Father testified that he only bottle fed M.T. once or twice because Mother nursed M.T. Father felt as if Mother did not want to share M.T. with him and that Mother wanted M.T. all the time. Father affirmed that he wanted a role in M.T.'s life and did not dispute that Mother is a good mother.

Justin Hargis, Carla Hargis, and Araceli Lopez testified about their observations of Father, Mother, and M.T. Justin Hargis and Carla Hargis engaged socially with Father and Mother on several occasions in Eagle Pass. Justin described Father as a proud and interested father. He stated that Father would engage with and hold M.T. whenever he had the opportunity. He described Mother as a protective mother and stated that Mother "very much wanted to be the primary person

to hold the baby and bond with the baby." Carla described Father as a present, caring, and affectionate father. Araceli Lopez, a friend of Mother, described Father and M.T.'s relationship as "sparse" because she could not recall a time when Father held M.T. However, Araceli acknowledged that she had only observed Father with M.T. on one occasion. Araceli described Mother and M.T.'s bond as "inseparable."

At the time of trial, M.T. was approximately twenty-one months old. Mother testified that M.T. is a healthy and happy boy, is advanced for his age, and is adjusted to San Diego. Mother stated that M.T. attends day care while she is working and that M.T.'s day care costs about $1,060 per month. Mother was unaware how much day care costs in Eagle Pass, but she acknowledged that it is less expensive. Mother and M.T. are both covered by Father's medical insurance.

The evaluator observed that M.T. is bonded with Mother. The evaluator opined that, through no fault of his own, Father had not had the opportunity to raise M.T. or to build a relationship with M.T. The evaluator did not have any concerns with either Father or Mother as parents. The evaluator determined that both Father and Mother are caring and loving parents and that M.T. should have access to both of them.

Viewing the evidence in the light most favorable to the jury's verdict and deferring to the jury's resolution of conflicts in the evidence and determinations of credibility, we conclude there is more than a scintilla of evidence to support the jury's verdict that imposition of a geographic residency restriction within 300 miles of Eagle Pass, Texas was in M.T.'s best interest. Based on the evidence indicating that M.T. has had minimal contact and access to Father while Mother resided in California, the jury could have reasonably determined a geographic residency restriction was in M.T.'s best interest because it would enable M.T. to have frequent and continuous contact with Father, as well as give Father an opportunity to share in the rights and duties of raising M.T. *See* TEX. FAM. CODE ANN. § 153.001(a)(1), (3) (stating the public policy of Texas is to "assure

that children will have frequent and continuing contact with [their] parents" and to "encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage"). The jury also could have reasonably determined that Mother's reasons for wanting to remain in California, mainly her familial support and her potential employment opportunities, were sufficiently outweighed by M.T.'s need to have consistent access and contact with both of his parents. On this record, we conclude that the evidence is legally sufficient to allow reasonable and fair-minded people to reach the verdict under review. *See City of Keller*, 168 S.W.3d at 827. Accordingly, Mother's challenge to the legal sufficiency of the evidence supporting the jury's verdict is overruled.

**CONCLUSION**

We affirm the trial court's order.

Rebeca C. Martinez, Justice